**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

_____

| | |
|---|---|
| ELIZABETH CANTAFI, ADMINISTRATOR ) | |
| OF THE ESTATE OF ZACHARY CANTAFI ) | |
| ELIZABETH CANTAFI, DANA ANDREWS ) | |
| and DANIELLE KORNACKI ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | NO. 3:23-CV-1245-KAD |
| ) | |
| STEPHANIE GRAYBEAL, ) | |
| UBER TECHNOLOGIES, INC., ) | |
| PORTIER, LLC, RASIER, LLC, VINCENT LISI, ) | |
| EDGAR PASTRANA and ASHLEY SULEWSKI ) | |
| Defendants. ) | OCTOBER 10, 2023 |

_____

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO REMAND TO CONNECTICUT SUPERIOR COURT

Plaintiffs Elizabeth Cantafi, administratrix of the estate of Zachary Cantafi, et al, hereby

submit this memorandum of law in support of their Motion to Remand this action back to the

Connecticut Superior Court.

> For generations, parents have admonished their children not to get into cars with strangers… But in today's 'sharing economy,' that warning is an anachronism: every day, millions of Americans summon unknown drivers with the press of a button. At the same time, the danger of taking a ride from a stranger has not entirely disappeared. As with other growing pains of twenty-first-century economics, courts must now determine what is to be done about the risk of that old-fashioned danger in a market shaped by new players and new technologies.

_Search v. Uber Technologies, Inc._, 128 F. Supp. 3d 222 (D.D.C. 2015).

1

The late Mr. Cantafi was not a passenger in a stranger's car, but a bicyclist mowed down by one, a victim of old-fashioned danger brought by this new economic power.

## I.      Background Facts

On August 29, 2021, Defendant Stephanie Graybeal, while driving for Uber Eats in Spokane, Washington, negligently drove her car into the intersection of Hawthorne and Division Streets and killed Zachary Cantafi. ECF 1-1, P4-5 of 69, ¶¶1-3. Defendant Graybeal, under the influence of cannabis, drove too fast and sent the 25-year-old Mr. Cantafi flying, his landing caused multiple fractures in his skull, back and leg bones. Id. Mr. Cantafi went into a coma and died the next day, August 30, 2021. Id., P5 of 69, ¶2, ¶5; P6, ¶9.

### A.  Procedural Action

Plaintiffs placed in the hands of a Connecticut marshal a package of documents constituting this action on August 24, 2023. Under C.G.S. §52-593a, that marshal made service and Plaintiffs filed this action September 15, 2023, choosing as a forum the Connecticut Superior Court. Mr. Cantafi's estate and his loved ones – the Plaintiffs - filed this 22-count complaint against Defendant Graybeal, three corporations (Uber Technologies, Inc. ("Uber"), Rasier, LLC and Portier, LLC (all three collectively the "Uber Defendants") and against three individuals who live in Connecticut and work for Uber: Vincent Lisi, Edgar Pastrana and Ashley Sulewski.  The complaint sounds in various species of tort including negligence and recklessness against all defendants and against the Uber Defendants Plaintiffs make claims of violations of the Connecticut Unfair Trade Practices Act.

Shortly after receiving suit, the Uber Defendants gave notice of removal of this action September 22, 2023 (ECF 1). With inflammatory language characteristic of defense, Defendants

claim this is a "fraudulent joinder."[1] Plaintiffs dispute that, and the law and allegations of their complaint support their Motion to Remand.

Against the CT Defendants, Plaintiffs pled three individuals counts of negligence Count 10, against Defendant Lisi, Count 11, against Defendant Pastrana; and Count 12, against Defendant Sulewski. The allegations against the Lisi, Pastrana and Sulewski present colorable claims.


**B.  Uber and its associated defendants Graybeal, Rasier, LLC and Portier, LLC All Participated in a Scheme that Demanded Distracted Driving**

Plaintiffs pled multiple negligence and recklessness counts against Defendant Graybeal and the Uber Defendants, all with similar allegations: that Uber Defendants demanded their drivers engage in distracted driving to complete the task for which they were contracted.

Against Defendant Graybeal, Plaintiffs pled that she operated her vehicle while using the UberEats application (ECF 1-1, Count One, ¶8.f.) and that she was distracted (Id., Count Three, ¶2.b.). Against the Uber Defendants, Plaintiffs alleged a pattern and practice where these three companies:

> a.  Permitted drivers to interact with the Uber Eats App, such as touching, sliding and scrolling to different pages of the Uber Eats App, while driving;
> b.  Designed an app that encourages drivers to look away from the road to their phones when receiving a delivery request;

---

[1] Rather than use the more common term "improper joinder," Defendants open their case using loaded words like fraudulent in an attempt to impugn Plaintiffs, who still grieve the death of the decedent Zachary Cantafi. "We adopt the term "improper joinder" as being more consistent with the statutory language than the term "fraudulent joinder," which has been used in the past. Although there is no substantive difference between the two terms, "improper joinder" is preferred." *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 571 n.1 (5th Cir. 2004). See also *Advanced Indicator & Mfg., Inc. v. Acadia Ins. Co.*, 50 F.4th 469, 473 n.1 (5th Cir. 2022).

c.  Designed an app that encourages drivers to look away from the road to their phone to look at a requester's location to determine whether to accept a delivery request;

d.  Designed an app that encourages drivers to look away from the road to their phone when receiving various notifications including GPS alerts;

e.  Designed an app that encourages drivers to look away from the road to pay constant attention to their phone;

f.  Designed an app that encourages drivers to look away from the road to respond vigilantly to requests and/or notifications;

g.  Promoted distracted and unsafe driving by requiring Uber drivers to respond to delivery requests in a limited period of time while driving;

h.  Failed to include adequate information or warnings to Uber Drivers that operating of the Uber Eats App while driving would cause distracted and unsafe driving;

i.  Failed to provide adequate training for Uber Eats drivers;

ECF 1-1, Count Four, ¶¶9.a-i.

In ¶9.p. of Count Four, Plaintiffs alleged further that Uber (and in other counts, the Rasier and Portier) "Failed to use the copious quantity of data available to the company to train, retrain, limit or otherwise prevent the defendant, Graybeal, from operating a vehicle in an unsafe way, including, but not limited to speeding and operating a vehicle under the influence of marijuana on the date in question which caused the collision."

In other parts of the complaint, Plaintiffs summarily referred to these as known issues with the Uber or UberEats app. In short, Uber Defendants market and sell a service which requires distracted driving, and Mr. Cantafi died because of this. Mr. Cantafi's estate, heirs and family members come before this Court to argue that not only are the corporations and limited liability companies responsible, but individuals who work at these places, who negligently make decisions that led to Mr. Cantafi's death.

Uber's business model is well understood:

In a nutshell, Uber provides a service whereby individuals in need of vehicular transportation can log in to the Uber software application on their smartphone,

> request a ride, be paired via the Uber application with an available driver, be picked up by the available driver, and ultimately be driven to their final destination. Uber receives a credit card payment from the rider at the end of the ride, a significant portion of which it then remits to the driver who transported the passenger.

*O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1135 (N.D. Cal. 2015).

With that, Plaintiffs allege that the Uber Defendants collect mountains of data[2] on their customers and drivers.

> The Defendants noted above, which include all the "Uber" and "Uber Eats" entities obtain up to three gigabytes (3 GB) per month from each driver and requires real-time connectivity from its drivers. The Defendant has approximately 5.4 million drivers and secures real-time data from each of those persons. This is over 16,200 terabytes of data collected per month from its drivers, or one hundred times (100x) the amount of the print and digital collection of the United States Library of Congress. Each year, the amount of data collected by the Defendants is approximately 200 Petabytes, which, coincidentally, is the equivalent amount of data of the entire collection of all printed materials on the planet Earth.

ECF 1.1, Complaint, General Allegations ¶16.

It is in part this access to unprecedented quantity and quality of data and the conclusions that may be drawn from this data that makes Plaintiffs' claims of negligence against the individual defendants in Uber's employ viable. It is highly likely that the Uber Defendants massive collection of data allows them to predict and in real time identify distracted driving.

---

[2] See also Peacher, Halie B., "Regulating Data Privacy of Connected Vehicles: How Automotive Giants Can Protect Themselves and Their Golden Goose", *Alb. L.J. Sci. & Tech.* Vol 30.1, P86, published in 2020. https://www.albanylawscitech.org/article/19153-regulating-data-privacy-of-connected-vehicles-how-automotive-giants-can-protect-themselves-and-their-golden-goose/attachment/51157.pdf Last checked October 10, 2023. Before describing the Uber hacks (P86), the article describes (P74) how "Auto manufacturers can collect 25 GB of data from vehicles at the rate of 2 GB per hour. At that rate, automotive manufacturers may increase profits, enhance driving experiences, and make driving safer. Companies that own and sell the data from these vehicles are expected to gain a thirty-five percent increase in revenue."

### C.  Lisi Was Allegedly Negligence as the Head of Security Failed to Prevent Uber From Hiring Bad Drivers

Plaintiffs' allege that Defendant Lisi was and is an Uber employee in the position of Global Investigations since April 2019. ECF 101, P28 of 69, Count 10, ¶¶1-2. Defendant Lisi, a Groton, CT resident, is responsible for creating and leading a program which will quickly and thoroughly identify and resolve potential wrongdoings which could harm Uber. Id., ¶¶3-4.

Defendant Lisi's responsibilities at Uber include building out the corporate investigative function at Uber and developing policies and defining strategies. Id., P29, ¶5. Defendant Lisi leads a team of global investigators addressing fraud and abuse at Uber, among other things. Id., ¶6.

Plaintiffs contend that Defendant Lisi knew or should have known of issues related to Uber drivers being intoxicated, speeding or taking other unsafe actions. Id., P30, ¶8. Defendant Lisi knew or should have known that people like the decedent were subject to harm because of Uber's inability to deal with this. Id., ¶9. Defendant Lisi, as leader of the corporate security team, was negligent, in short, by failing to create security systems to weed out bad drivers like Defendant Graybeal. Id., ¶10.

### D.  Defendant Pastrana Was Allegedly Negligent by Failing to Take Action to Prevent Bad Drivers from working for Uber

Plaintiffs allege that Defendant Pastrana was an Uber employee in the position of Global Director of Customer Experience. ECF 1-1, p32 of 69, ¶1, ¶2. Defendant Pastrana allegedly

resides in Greenwich, (Id., ¶3) and is and was responsible for growing revenues while reducing

costs, including driving sales. Id., ¶4.

Defendant Pastrana allegedly led a team of 50 members at all levels of the Uber

organization, transforming operations. Id., ¶¶5-6. Defendant Pastrana was allegedly

responsible for customer care, including driver interactions, timely deliveries and other aspects

of customer care. Id., ¶7.

Defendant Pastrana, in his role at Uber, knew or should have known issues with the

driver program that allowed intoxicated and speeding drivers and that these resulted in injuries

to people. Id., at ¶¶8-10. Defendant Pastrana's customer experience team[3] failed to take action

that would have prevented this tragedy, identical steps that the security team should have

taken. Id., ¶11.


**E. Defendant Sulewski Was Allegedly Negligent by Creating an Atmosphere that Led to Dangerous Behavior by Uber Drivers**

Plaintiffs allege that Defendant Sulewski was an Uber employee in the position of Lead

and Global Account Executive, having worked at Uber since 2019. ECF 1-1, p35 of 69, ¶¶1-2.

Defendant Sulewski allegedly resides in New Britain, (Id., ¶3) and is and was responsible for

business and client development for Uber Eats (Id., ¶4).

Defendant Sulewski allegedly was a member of the Global Account team responsible for

operational improvement, restaurant delivery growth, analysis of quantifying all aspects of the

---

[3] ECF 1-1, Complaint, Count Eleven, ¶11, P33, contains a minor scrivener's error and refers to "corporate security" when it should say "customer experience" team.

delivery process and encouraging efficient delivery through the use of data-driven decision making. Id., ¶5. Defendant Sulewski allegedly knew or should have known of issues with the Uber Eats drivers' program, including those surrounding intoxicated and speeding drivers. Id., ¶¶6-7. Defendant Sulewski allegedly should have known that these issues led to harm. Id., ¶8.

Defendant Sulewski allegedly breached her duties to maintain safety on the public roadways in a number of ways, including encouraging unsafe driving through incentives and setting up new restaurant and business accounts, through the use of incentives, which she knew the Uber system could not handle, setting up Uber's paltry safety systems to fail. Id., ¶9.

II.     **Remand Back to Superior Court is Appropriate as Defendants Cannot Meet their Heavy Burdens of Proof**

Under the removal statute, 28 U.S.C. §1441(a), "any civil action in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." Once removed to district court, a motion to remand the case back to state court must be made within 30 days, unless the cause for remand is lack of subject matter jurisdiction, in which case it shall be remanded at any time before final judgment is entered. 28 U.S.C. §1447(c).

Defendants cannot show by clear and convincing evidence either prong of the *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998): actual fraud or that based on the pleadings, there is no possibility Plaintiffs can sustain a cause of action against the non-diverse defendants in state court.  "The defendant seeking removal bears a heavy burden of

proving fraudulent joiner, and all factual and legal issues must be resolved in favor of the plaintiff." *Id*.

"Removal jurisdiction must be strictly construed and enforced in favor of state court jurisdiction because the federal courts are courts of limited jurisdiction, and because removal of a case implicates significant federalism concerns." (internal citation omitted.) *Boehringer v. Smith & Nephew, Inc*., No. 18CV920 (WWE), 2018 WL 4735718, at *1 (D. Conn. Oct. 2, 2018). The balance must be strongly in favor of the defendant before disturbing the plaintiff's choice of forum. *Id*. "Any doubts must be resolved in favor of remand." *Soto v. Bushmaster Firearms Int'l, LLC.*, 139 F. Supp. 3d 560, 562 (D. Conn. 2015)(citing See *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 213 (2d Cir.2013)).

"Removal jurisdiction is evaluated according to the pleadings existing at the time the petition for removal was filed." *Id*., (citing *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57-58 (2d Cir. 2006)).  However, the court may exercise discretion to look outside the pleadings to determine if it has subject matter jurisdiction. (internal citation and quotations omitted.) *Campisi v. Swissport Cargo Servs., LP*, No. 09-CV-1507 (FB)(JMA), 2010 WL 375878, at *2 (E.D.N.Y. Jan. 26, 2010).

"All uncertainties in applicable state law are resolved in favor of the plaintiff, and the complaint is subjected to less searching scrutiny than on a motion to dismiss for failure to state a claim." (internal citation and quotations omitted.) *Id*.

Judge Chatigny found the standard similar to a Fed. R. Civ. P. Rule 11 standard: "the Rule provides that arguments for extensions, modifications, or reversals of existing law or for creation of new law are not sanctionable, provided they are not frivolous. [] In deciding

9

whether a claim exceeds the limits of permissible partisan advocacy, courts apply a standard of objective reasonableness." (internal citations omitted.) *Soto*, 139 F. Supp. 3d at 563. Thus, "The analysis under both Rule 11 and fraudulent joinder therefore turns not on how likely a claim is to succeed, but rather on whether the claim is objectively frivolous." *Id*. "[T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990).*

Judge Chatigny remanded *Soto* back to state court. In an improper joinder inquiry, "federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Id*. at 565–66.

Plaintiffs' claims against Defendants Lisi, Pastrana and Sulewski are arguable under state law, nor are they objectively frivolous. Remand is proper.

### III.   Plaintiffs Present Valid Claims Under Connecticut State Law That Mandate Remand

Plaintiffs present claims that are more than arguable under state law, per *Soto v. Bushmaster Firearms Int'l, LLC.*, 139 F. Supp. 3d 560, 562 (D. Conn. 2015).  Under existing precedents, Plaintiffs have a chance of success on their claims against Lisi, Pastrana and Sulewski.

Defendants have not explained to this Court why Plaintiffs claims have no reasonable argument to extend, modify or reverse the law as it stands. Defendants have not met the heavy burden required of them to remove this case to federal court. Defendants made no factual showing in their Notice of Removal that Plaintiffs committed actual fraud. Nor did Defendants'

Notice of Removal provide clear and convincing evidence how it is objectively unreasonable to suggest that Plaintiffs have no colorable claims against Defendants Lisi, Pastrana and Sulewski.

Defendants need to write more than a simple declaratory paragraph like ¶13 of their Notice of Removal to bring this case to the United States District Court. Defendants submitted Exhibits B and C, documents showing consent to removal, but Defendants provided no extraneous evidence like affidavits or job descriptions or organizational charts containing chains of command that meet a clear and convincing standard that Plaintiffs have no possibility of sustaining claims against Defendants Lisi, Pastrana or Sulewski.

A. **Existing Common Law Entitles Plaintiffs to Sue Corporate Actors Like Lisi, Pastrana and Sulewski in Negligence**

The right to hold corporate actors liable for personal torts, regardless of their corporate position, is a common-law right. *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 137, 2 A.3d 859 (2010) (citing *Ventres v. Goodspeed Airport, LLC*, 275 Conn. 105, 881 A.2d 937 (2005)). If plaintiffs claim a defendant is individually liable in tort, to establish that defendant's personal liability, the plaintiffs are not required to plead facts sufficient to pierce the corporate veil. *Id*., at 131-132.

Defendants' cursory argument that Lisi, Pastrana and Sulewski have no connection to the facts at issue here fails to address the Plaintiffs' common law right to sue corporate actors in negligence. Defendants' Notice of Removal lacks any assessment of the underlying allegations in the Complaint (ECF 1-1). Plaintiffs' claims will withstand the objectively frivolous Rule 11 standard and any subsequent a motion to strike in Superior Court under Practice Book §10-30, the state equivalent to FRCP 12(b)(6) failure to state a claim.

11

The Second Restatement of Torts puts Defendants Lisi, Pastrana and Sulewski squarely into negligence claims.

> It is true that, as a general matter, a defendant is not responsible for anticipating the intentional misconduct of a third party; see, e.g., 2 Restatement (Second), Torts § 302 B, comment (d), p. 89 (1965);19 unless the defendant knows or has reason to know of the third party's criminal propensity. The criminal misconduct of a third party may be foreseeable under the facts of a particular case, however, without a showing that the defendant had such actual or constructive knowledge of the third party's criminal propensity. As this and many other courts have recognized, when a defendant's conduct creates or increases the risk of a particular harm and is a substantial factor in causing that harm, or when the defendant otherwise has a legally cognizable duty to aid or protect another person, the fact that the harm is brought about by the actions of a third party does not relieve the defendant of liability, even though the third party's conduct is criminal, if the harm that occurred is within the scope of the risk created by the defendant's conduct or reasonably could have been anticipated in light of the defendant's duty to protect. Thus, when the harm resulting from the criminal misconduct of a third party is foreseeable in view of the facts and circumstances presented, there is no reason why the injured party should nevertheless be required to establish that the defendant had actual or constructive knowledge of the third party's criminal propensity.

*Doe v. Saint Francis Hosp. & Med. Ctr.*, 309 Conn. 146, 172–73, 72 A.3d 929, 946 (2013).

Plaintiffs have alleged all four elements of negligence[4] properly against Lisi, Pastrana and Sulewski. If there is a question about the range of duties that Uber security officers have in relation to the data Uber collects and its value to Uber and its users and drivers, previous Uber chief security officers have been convicted of felony charges for failing to report data breaches. See *United States v. Sullivan*, No. 20-CR-00337-WHO-1, 2023 WL 163489, at *1 (N.D. Cal. Jan. 11, 2023) (hereinafter "*Sullivan I*").

---

[4] "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 139, 2 A.3d 859, 870 (2010).

California Civil Code section 1798.82(a) imposes a duty to disclose a data breach upon a person or business that conducts business in California, and that owns or licenses computerized data that includes personal information. *United States v. Sullivan*, No. 20-CR-00337-WHO-1, 2022 WL 3716594, at *1 (N.D. Cal. Aug. 28, 2022)(Hereinafter "*Sullivan II*"). Facts established how Defendant Sullivan obstructed the Federal Trade Commission's investigation into hackers obtaining the personal information of Uber users, including 600,000 drivers' license numbers. *Sullivan I*, at *1-*2.

Other duties obviously flow from the collection, maintenance, storage and usage and examination of this data, and Plaintiffs merit the opportunity to explore them in discovery, and if need be, file amended complaints as to the extent of the negligence and malfeasance the individual and Uber Defendants engaged in by failing to manage this data to stop distracted and inebriated drivers.

And to defeat the removal and affirm the Motion for Remand, the Court need not reach the conclusions regarding this about all three Connecticut employees, just one. The Motion to Remand should be granted.

**B.  The Allegations Against Defendant Lisi Merit Remand**

Plaintiffs allege that Defendant Lisi was and is an Uber employee in the position of Global Investigations since April 2019. ECF 101, P28 of 69, Count 10, ¶¶1-2. Defendant Lisi, a Groton, CT resident, is responsible for creating and leading a program which will quickly and thoroughly identify and resolve potential wrongdoings which could harm Uber. Id., ¶¶3-4.

Defendant Lisi's responsibilities at Uber include building out the corporate investigative function at Uber and developing policies and defining strategies. Id., P29, ¶5. Defendant Lisi leads a team of global investigators addressing fraud and abuse at Uber, among other things. Id., ¶6.

Plaintiffs contend that Defendant Lisi knew or should have known of issues related to Uber drivers being intoxicated, speeding or taking other unsafe actions. Id., P30, ¶8. Defendant Lisi knew or should have known that people like the decedent were subject to harm because of Uber's inability to deal with this. Id., ¶9. Defendant Lisi, as leader of the corporate security team, was negligent, in short, by failing to create security systems to weed out bad drivers like Defendant Graybeal. Id., ¶10.

It is not objectively frivolous to sue the head of security at a global corporation failing to implement policies that would have prevented decedent Cantafi from bad drivers at Uber, or, for implementing policies that failed to stop bad drivers at Uber. This is not far removed from the facts of *Nisbet v. Olmeda*, 15 Conn. App. 6, 544 A.2d 642 (1988), where a plaintiff bank employee went to trial against a security guard and his employer for having bad policies that led to the plaintiff suffering injury during a bank robbery.

*Doe*, *supra*, when applied to Defendant Lisi's situation, support Plaintiffs' proper joinder of him. Plaintiffs do not have to establish actual or constructive knowledge that Defendant Lisi knew of Defendant Graybeal's criminal propensity. Plaintiffs only need to show that as the head of security, it was foreseeable to Defendant Lisi that a third party – an Uber driver – would drive intoxicated and beyond the speed limit and kill someone. Plaintiffs must make a factual showing here that the deathly conduct was within the scope of the risk created by Defendant

14

Lisi or could have been anticipated in light of Defendant Lisi's duty to protect. His job

description, as alleged, is to protect Uber, its employees and its customers from harm. ECF 1-1,

Complaint, Count 10, ¶4.

Doe and the Second Restatement tell Defendant Lisi is not relieved of responsibility for

criminal conduct of the third-party tortfeasor, when he had a duty to protect people from

foreseeably bad conduct. It is foreseeable that a driver for a delivery service will drive impaired

and will drive above the speed limit and that Uber can track and act on this data in real time.[5]

---

[5] In 2018, two University of Chicago academics and two student researchers published a paper "The Cost of Convenience: Ridesharing and Traffic Fatalities" positing that traffic fatalities in the United States have increased three percent, or 987 per year, since ridesharing apps became available to the general public. See https://bfi.uchicago.edu/wp-content/uploads/BFI_RB_Barrios_The-Cost-of-Convenience_Ridesharing-and-Traffic-Fatalities.pdf Last checked October 5, 2023.

The Massachusetts Department of Public Utilities published an annual report in 2022 indicating that in 2021, rideshare drivers from Uber and Lyft were responsible for 1,098 collisions in Boston alone, or about 25 percent of all accidents in Boston. The Mass.gov website link is broken https://www.mass.gov/info-details/2021-rideshare-data-report#average-speed,-distance,-and-accident-data- but another website writer, Christian MilNeil of StreetsBlog Mass, captured those alarming statistics: https://mass.streetsblog.org/2022/09/20/state-data-show-uber-and-lyft-drivers-were-involved-in-over-1000-crashes-in-the-city-of-boston-last-year Last Checked October 5, 2023.

Uber and its corporate actors absolutely know about these issues, and the foreseeability that their drivers will speed, maim and kill. Uber's own website indicates that rideshare drivers will have speed limit alerts: "The Driver app displays the live location speed limit and can visually alert drivers if they go above the posted speed limit." https://www.uber.com/us/en/safety/road-safety/?uclick_id=33da2748-3b30-48d1-95fa-1e92d8709e7b Last checked October 5, 2023.

Uber even purports to help drivers monitor the speed of drivers: "Helping you stay at a safe speed You do your best to drive under the speed limit. Just in case, we've added optional in-app alerts to help you keep track of your speed and the posted limits." See https://www.uber.com/blog/introducing-new-driver-safety-features/ dated September 5, 2018, and datelined in the US. Last checked October 5, 2023.

Uber and its actors most certainly have wrestled with the question of how to monitor the toxicity of drivers, and Plaintiffs should have the ability to discover if Defendant Lisi has considered an option like installing ignition interlock devices or requiring speed governors on cars that Uber contracts with.

If this delivery driver worked for Domino's or some pizza delivery service where there was an on-site manager to monitor the driver, the state of impairment would be readily visible. Uber cannot reasonably monitor the state of impairment of every single one of its drivers, so Plaintiffs should be able to understand what reasonable steps Uber's Senior Director of Global Security and Investigations has taken. Plaintiffs should be able to prosecute their case in state court in part on the theory that Defendant Lisi knew or should have known that he can have an algorithm determine driver safety and identify in real time bad driving but rejected this and chose not to protect people from speeding, drunk drivers. These drivers are not monitored by on-site employers for their fitness to drive.

---

Uber monitors more than speed. Defendant Lisi has been quoted in news stories showing how Uber monitors datasets from drivers so closely and precisely that Uber can pinpoint deliveries of packages that may involve scammers who try to bilk people out of cash, like fraudsters asking grandparents to send money for bail. In Brevard County, Florida earlier this year, Defendant Lisi and Uber stopped a driver mid-ride to return money to victims of such a fraud. See "'It's Sickening:' Florida seniors saved from money-stealing scam thanks to new technology," by Esther Bower, published March 20, 2023 https://www.fox35orlando.com/news/its-sickening-local-seniors-saved-from-money-stealing-scam-thanks-to-new-technology ; see also "Brevard County Sheriff's Office teams up with Uber to stop fraud scheme targeting older victims", by Scott Heidler, March 21, 2023, https://www.wesh.com/article/uber-scam/43379561 last checked October 5, 2023.

Plaintiffs are well above the very low bar of objectively frivolous in making this claim against Defendant Lisi. Plaintiffs should have the right in litigation in Connecticut Superior Court to flesh out the facts of their claim against Defendant Lisi. The Plaintiffs' Motion to Remand should be granted.

### C.  Plaintiffs' Claims Against Defendant Pastrana Should Be Remanded to State Court

The same common law right of holding actors within a corporation accountable that applied to Lisi apply here to Pastrana and Sulewski. Defendants Pastrana and Sulewski had similar jobs in that they were focused on timely deliveries and business development. Both Pastrana and Sulewski, in their roles at Uber, knew or should have known issues with the driver program that allowed intoxicated and speeding drivers and that these resulted in injuries to people. Both Defendants failed to customer experience team failed to take action that would have prevented this tragedy.

Plaintiffs allege that Defendant Sulewski was an Uber employee in the position of Lead and Global Account Executive, having worked at Uber since 2019. ECF 1-1, p35 of 69, ¶¶1-2. Defendant Sulewski allegedly resides in New Britain, (Id., ¶3) and is and was responsible for business and client development for Uber Eats (Id., ¶4).

Defendant Sulewski allegedly was a member of the Global Account team responsible for operational improvement, restaurant delivery growth, analysis of quantifying all aspects of the delivery process and encouraging efficient delivery through the use of data-driven decision making. Id., ¶5. Defendant Sulewski allegedly knew or should have known of issues with the

Uber Eats drivers' program, including those surrounding intoxicated and speeding drivers. Id., ¶¶6-7. Defendant Sulewski allegedly should have known that these issues led to harm. Id., ¶8.

Defendant Sulewski allegedly breached her duties to maintain safety on the public roadways in a number of ways, including encouraging unsafe driving through incentives and setting up new restaurant and business accounts, through the use of incentives, which she knew the Uber system could not handle, setting up Uber's paltry safety systems to fail. Id., ¶9.

The negligence here alleged relies on theories discussed of negligent entrustment and negligent marketing in the remanded *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 202 A.3d 262, 283 (2019). *Soto's* exploration of these forms of negligence included the use of the automobile. In *Soto*, the Connecticut Supreme Court refused to expand negligent entrustment to the facts of the Sandy Hook case. "We recognize that some of our sister state courts have permitted negligent entrustment actions to proceed when, although there was no indication that the direct entrustee was incompetent to use a dangerous item, there was reason to believe that the entrustee would in turn share the item with a *specific* third party who would misuse it." *Id*., at 82.

Here, the negligence is that Defendant Sulewski and Uber knew that the profit motive would encourage negligent driving, and the specific third parties are identifiable. Defendant Sulewski, Plaintiffs allege, knew or should have known that creating incentives for Uber drivers to do more, faster would lead to harm. Defendant Sulewski did not entrust the vehicle to this third party, but engaged in conduct that enticed people to participate, knowing that their participation would and could lead to harm.

Furthermore, Uber and Sulewski could identify those potentially bad drivers, based on the massive amounts of data that Uber has and collects on every single Uber ride. *Soto* recognized that drunk people or blind people should not drive cars. "[O]ne may be negligent for entrusting an automobile to such users even in the absence of any particular knowledge about their individual driving skills, experience, or temperament." *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 84, 202 A.3d 262, 283 (2019). Here, the negligence is that Uber and Sulewski had that knowledge about individual driving skills, experience and temperament, and collected such information every second of every ride that Graybeal made for Uber.

Here, Plaintiffs allege that Defendant Sulewski understood Uber encouraged bad drivers like Graybeal to get behind the wheel, and then Defendant Sulewski did nothing to prevent this from happening.

A New York federal court dismissed an action for false advertising since the court saw as puffery Uber's statement that its drivers "provide[d] the safest ride on the road" and were the "gold standard" of safety practices. See *XYZ Two Way Radio Service, Inc. v. Uber Techs., Inc.* 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016); cf *L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*, 114 F. Supp. 3d 852, 2015-2 Trade Cas. (CCH) ¶ 79265 (N.D. Cal. 2015) (the court there saying it could not determine if such language was nonactionable puffery or aspirational statements that could be measured).

Yet Plaintiffs' claims are not about the marketing to the public, but about the negligent operation that Uber and employees like Sulewski and Pastrana knew this, but continued to pursue activities that brought bad drivers to the streets and endangered and harmed people like Mr. Cantafi.

19

Generally speaking, an employer cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person' background or if such an investigation would not have revealed any reason not to hire that person. *Search v. Uber Technologies, Inc.*, 128 F. Supp. 3d 222, 230 (D.D.C. 2015). The Uber Defendants have failed to win summary judgment on questions of fact surrounding the employer-employee relationship. For example, see *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1135 (N.D. Cal. 2015).

But here, more importantly, is not that the Uber Defendants failed to do proper background checks, but that the individual defendants – Lisi, Pastrana and Sulewski – with access to this data, failed to pinpoint and exercise discretion in real time over distracted driving that they knew the Uber Defendants business model caused.

**IV.     The Court Should Remand These Claims to the Connecticut Superior Court**

For the reasons stated above, the Court should remand this action to the Connecticut Superior Court.


___/s/_____
Peter Christopher Bowman
BBB Attorneys, LLC
3651 Main Street
Suite 200
Stratford, CT 06614
203-562-0900
203-562-0902 (fax)
filing@bbbattorneys.com


___/s/_____
Kenneth James Krayeske
BBB Attorneys, LLC

3651 Main Street
Suite 200
Stratford, CT 06614
203-562-0900
203-562-0902 (fax)
kkrayeske@bbbattorneys.com